```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/09
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

JOHN M. ADORNO et al.,                    :

                    Plaintiffs,           :

          - against -                     :

PORT AUTHORITY OF NEW YORK                :
AND NEW JERSEY,
                                          :
                    Defendant.
                                          :
- - - - - - - - - - - - - - - - - -x

**OPINION**

06 Civ. 593 (DC)

**APPEARANCES**     PEDOWITZ & MEISTER, LLP
                    Attorneys for Plaintiffs
                        By:  Arnold H. Pedowitz, Esq.
                    1501 Broadway, Suite 800
                    New York, New York  100036

                    MILTON H. PACHTER, Esq.
                    Attorney for Defendant
                        By:  Karla D. Denalli, Esq.
                             Megan Lee, Esq.
                             Timothy G. Stickelman, Esq.
                    225 Park Avenue South, 13th Floor
                    New York, New York  10003

**CHIN, District Judge**

          In this case, a group of Hispanic employees sue the
Port Authority of New York and New Jersey (the "Port Authority")
alleging discrimination on the basis of national origin, race,
and ethnicity in the Port Authority's appointments and promotions
practices.  Defendant moves for summary judgment dismissing the
complaint.  Plaintiffs move for sanctions under Rule 37 of the
Federal Rules of Civil Procedure, alleging defendant spoliated
evidence.  For the reasons that follow, defendant's motion is
granted in part and denied in part, and plaintiffs' motion is
denied.

## BACKGROUND

### A.  The Facts

The facts are drawn from the pleadings, the parties'
declarations, depositions, and other documentary evidence
submitted in support of the parties' motions.  For purposes of
deciding defendant's summary judgment motion, the facts have been
construed in the light most favorable to plaintiffs, and
conflicts in the evidence have been resolved in their favor.  For
purposes of deciding plaintiffs' motion for sanctions, however, I
have applied no such favorable construction.

#### 1.  The Parties

##### a.  Plaintiffs

Plaintiffs John M. Adorno, John Castro, Hector
Martinez, Juan D. Mendez, Silfredo Rivera, Erick Torres, and
Alberto Welch are of Hispanic origin and are or were police
officers employed by the Port Authority.  They allege they were
improperly denied promotions because of their national origin,
race, and ethnicity.

##### b.  The Port Authority

The Port Authority is a bi-state transportation agency
created by New York and New Jersey that manages the bridges,
tunnels, bus terminals, airports, the Port Authority Trans-
Hudson, and seaports in the New York metropolitan area.  (Am.
Compl. ¶ 15).  The Port Authority has a Public Safety Department
(the "Department") that employs uniformed police officers to
patrol its transportation facilities.

## 2. Promotions Process

This action concerns the promotion of the Department's police officers to the rank of Detective and Sergeant, as well as appointments to the Department's Silver Shield program. Plaintiff Silfredo Rivera alleges he was eligible for promotion to Detective and/or Sergeant starting in 1999, but was passed over for less-qualified non-Hispanic officers; all other plaintiffs allege they were eligible for promotions to Detective and/or Sergeant from 2002 onward, but were passed over. (Id. ¶ 55).

Port Authority officers begin their careers as uniformed police officers. The rank of Detective is higher than police officer, and appointment to Detective does not require a test. The rank of Sergeant is the first official supervisory level in the department's leadership hierarchy. An examination is required for appointment to Sergeant. (Id. ¶ 34). The Silver Shield program was implemented in 2003 to give police officers the opportunity to work alongside detectives and advance in rank. (Def. Exs. I at 34, K at 119-20).[1]

### a. Detective Promotions

Prior to 2005, the Port Authority did not have a written procedure in place for promotion of police officers to Detective. (Def. Opp'n Ex. G). The procedure varied somewhat

---

[1]     Each side submitted two sets of exhibits, exhibits in support of and in opposition to defendant's motion for summary judgment, as well as exhibits in support of and in opposition to plaintiffs' motion for sanctions.

under different Superintendents in the time period from 2002
onward, but the general practice remained the same.[2]

To indicate their interest in being promoted to
Detective, police officers could submit written expressions of
interest (known as "Handwrittens") to their supervisors.  (Pls.
Exs. 2 at 79, 3 at 9-10).  Officers were not always notified of
Detective vacancies.  (Pls. Opp'n Ex. 8 at 73-74).  In 2002,
however, the Department solicited applications for Detective
promotions and invited police officers to submit Handwrittens
(Id. Ex. 9 at 79).  All plaintiffs in this action except Rivera
submitted Handwrittens in 2002 seeking promotion to Detective.
(Am. Compl. ¶ 28).

Candidates' Handwrittens were not substantive
applications but rather one-line statements from officers
interested in promotion.  (See Def. Opp'n Ex. I).  To make
promotion determinations, Department leadership relied primarily
on the recommendations of the Department's thirteen Commanding
Officers (the "COs").  The COs communicated their recommendations
verbally, by email, via memorandum on paper, or through
forwarding performance appraisals and Handwrittens from
particular police officers to headquarters.  (See Pls. Exs. 2 at

---

[2]     After the events of September 11, 2001, Joseph Morris
was appointed acting Superintendent and Chief of the Public
Safety Department at the Port Authority.  He was responsible for
promotions until a permanent Superintendent could be appointed.
(Def. Opp'n Ex. D at 6).  In April 2001, Charles DeRienzo was
appointed Superintendent and oversaw changes in the promotions
process for Detective and Sergeant.  (Id. Ex. F at 7-8).
DeRienzo left in May 2004 and former Deputy Superintendent Samuel
Plumeri was appointed Superintendent.  (Def. Opp'n Mem. at 2).

- 4 -

143, 11 at 26-27, 14 at 64; Pls. Opp'n Ex. 30). Emails from COs recommending candidates were deleted and not retained by defendant. (See Pls. Ex. 1 at 125).

Promotion folders were created for recommended candidates and forwarded to the Superintendent or his delegates for review and final promotion decisions. (See Pls. Opp'n Ex. 8 at 19-21). The folders included some or all of the following: performance appraisals, sick and absence reports, disciplinary information, arrest records, recommendation letters from the candidate's CO, if any, and/or a color photograph of the candidate. (See id. Exs. 3 at 92-93, 7 at 50-64, 85-87, 90-93, 9 at 172; Def. Ex. K at 172-75).

### b. Sergeant Promotions

To be eligible for promotion to Sergeant, a police officer must be on the job for two years and pass an examination. (Ford Aff. ¶ 5). Those who passed the Sergeant's examination were placed on a "Horizontal Roster." (Am. Compl. ¶ 41; Ford Aff. ¶ 6). Candidates were not ranked on the Horizontal Roster according to test performance but listed in alphabetical order. (Ford Aff. ¶ 6). The Port Authority administered the exam in 2002 and issued the Roster in August 2002.

When the need for Sergeants arose, the Department would solicit recommendations from COs. As with Detective promotions, Sergeant promotions were based primarily on the recommendations of COs and the review of promotion folders created for recommended candidates. As with their Detective recommendations,

- 5 -

COs made verbal recommendations for Sergeant promotions, wrote emails or memorandums, and/or forwarded a performance appraisal about the candidate to headquarters. (Pls. Ex. 11 at 26-27; Pls. Opp'n Exs. 23, 27, 33). Emails from COs recommending candidates were deleted and not retained by defendant. (Pls. Ex. 1 at 125).

During his tenure as Superintendent from 2002 to April 2004, Charles DeRienzo established a "Chiefs' Board" to help make final Sergeant promotion determinations. (Def. Ex. I at 47). The Chiefs' Board was a group of Chiefs, Assistant Chiefs, and Deputy Superintendents who reviewed candidate promotion folders and voted on them, submitting their voting results to DeRienzo. (See Pls. Opp'n Ex. 36). The Chiefs' Board met twice under DeRienzo. No documents were retained from these meetings except for the Board's voting record. (See id. Exs. 34, 35). DeRienzo's successor Samuel Plumeri did not convene the Chiefs' Board; instead, he relied on promotion evaluations from his deputies. (Def. Ex. J at 15, 39).

### c. The Silver Shield Program

Police officers were not generally notified of openings in the Silver Shield program or solicited to submit Handwritten applications. (Pls. Opp'n Ex. 8 at 105). Outreach for the program was conducted through the COs, who were contacted for candidate recommendations. (Id.). As with recommendations for Detective and Sergeant promotions, COs made their recommendations both orally or in writing, and emails regarding candidates were deleted and not retained. (Pls. Ex. 1 at 125).

## d. **Lack of Criteria**

Promotion determinations were heavily determined by CO recommendations, and recommendations were largely left to the COs' discretion, as the Port Authority did not have written guidelines regarding promotions. (Pls. Opp'n Ex. 8 at 29, 31-32). The departmental leadership also did not otherwise instruct COs regarding selection criteria for candidates for Detective, Sergeant, or the Silver Shield program. (Id. Exs. 9 at 77-78, 4 at 36). DiRienzo did testify, however, that he met with COs and asked them to consider diversity in their recommendations. (Id. Ex. 9 at 38-40).

Some COs submitted a list of recommended candidates in order of preference. Others did not. Some COs gave detailed explanations about their recommended candidates or attached performance appraisals to their recommendations. Others simply submitted a list of names. (See id. Exs. 26, 27, 30, 33). As one CO testified:

> There are no rules. There are no orders.
> There are no protocols. . . . There never has
> been any. The Commanding Officer, based on
> his or her recommendations, try [sic] to
> recommend people that are very promotable
> based on activity, based on sick, based on
> departmental or CCIU charges, based on
> timeliness and based on a police officer's
> willingness to do more than asked to him or
> her, being out there and volunteering for
> things. That's not quantified in any memo.
> That's the Commanding Officer's position as
> to who he or she believes does the best job.

(Def. Ex. I at 57-58).

- 7 -

The CO acknowledged he had developed these factors only for himself, however, and "what I thought I needed to do to make myself promotable as a police officer, to be where I was supposed to be, to look and act the part. . . . I formulate this on what I thought the best candidate for promotion would be." (Id. at 58-59).

Department leadership also lacked formal criteria or written guidance for making final promotion determinations. (Pls. Opp'n Ex. 8 at 85-86). Nevertheless, witnesses testified that they would look at factors such as an officer's arrest record, disciplinary record, absence record, job performance, and "people skills." (Id. at 81-94, 99).

## 4. Promotion of Hispanic Officers

### a. Department Demographics

From 2002 to the end of 2005, Hispanic officers made up the following percentage of police officers, Detectives, and Sergeants in the Department. (Id. Ex. 25).

|  | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|
| Police Officer | 13.6% | 14.0% | 14.1% | 14.0% |
| Detective | 11.0% | 13.7% | 12.3% | 11.1% |
| Sergeant | 9.6% | 8.0% | 7.6% | 11.1% |

### b. Detective Promotions

Forty-seven officers were promoted to Detective between January 2002 and October 2006. (Id. Ex. 18). In this time period, five of the promoted officers were Hispanic.[3]

---

[3]    I disregard plaintiffs' unsubstantiated claim that one of the Hispanic officers promoted in 2003, William Jimeno, should

|                  | 2002 | 2003 | 2004 | 2005 | 2006 (to October) |
|------------------|------|------|------|------|-------------------|
| Hispanic         | 1    | 4    | 0    | 0    | 0                 |
| Non-Hispanic     | 2    | 25   | 4    | 9    | 2                 |

### c. Sergeant Promotions

One hundred thirteen individuals were promoted to Sergeant from January 2002 to October 2006, fifteen of whom were Hispanic. (Id.). Hispanic police officers comprised approximately ten percent of the 2002 Horizontal Roster (around 35 people) that was released in August 2002. (Ford Aff. ¶ 12).

|                  | 2002 | 2003 | 2004 | 2005 | 2006 (to October) |
|------------------|------|------|------|------|-------------------|
| Hispanic         | 1    | 1    | 0    | 8    | 5                 |
| Non-Hispanic     | 11   | 40   | 4    | 21   | 27                |

Plaintiffs claim that the Port Authority promoted eight Hispanic officers in 2005, including plaintiff Rivera, only after it became aware of plaintiffs' intention to file EEOC charges. (Pls. Opp'n Mem. at 20-21). The Port Authority Police Hispanic Society held a press conference in April 2005 announcing its intent to file a discrimination complaint against Port Authority with the EEOC. (Pls. Opp'n Ex. 32). In May, the Port Authority

---

not be counted because he never worked as a Detective but was promoted simply so that he could retire in the rank of Detective. (Pedowitz Decl. ¶ 14). This assertion is based on the declaration of plaintiffs' counsel repeating hearsay testimony from Detective Juan Garcia. Garcia himself refused to submit a declaration in support of plaintiffs' opposition papers. (See Pedowitz Decl. ¶¶ 9-15). To the extent plaintiffs cite Garcia's testimony for the truth of such testimony, they rely on inadmissible hearsay that may not be considered for summary judgment purposes. See Fed. R. Civ. P. 56(e)(1).

promoted five Hispanic officers to Sergeant. (Pls. Opp'n Ex. 18). Former Chief of Staff Edmond Schorno admitted he heard about the press conference from "somebody in Public Affairs," who mentioned . . . [the Police Hispanic Society] might be filing a lawsuit." (Pls. Ex. 24 at 115-16). Plaintiffs then filed discrimination charges with the EEOC in June and July 2005, and the Port Authority promoted another three Hispanic officers in October 2005. It promoted five Hispanic officers, including plaintiff Adorno, in September 2006. (Pls. Opp'n Ex. 18).

## d. Silver Shield Appointments

From its formal inception in 2003 to the end of 2006, forty-two officers were appointed to the Silver Shield program, four of whom were Hispanic.[4]

|                  | 2003 | 2004 | 2005 | 2006 |
|------------------|------|------|------|------|
| Hispanic         | 1    | 1    | 2    | 0    |
| Non-Hispanic     | 15   | 2    | 16   | 5    |

At some point, Schorno noticed that the Silver Shield program was not diverse, and he made efforts to increase diversity in the program. (Id. Ex. 5 at 85-87).

---

[4]     Plaintiffs and defendant each submitted a list of Silver Shield members with dates of appointment to the program. (Def. Ex. N; Pls. Opp'n Ex. 19). Plaintiffs' lists includes thirty-eight people, covering appointments made from 2002 to 2005. Defendant's list includes forty-seven people, covering appointments made from 2001 to 2007. Because the record indicates the program was started in 2003, I count only appointments from 2003. On both lists, the number of Hispanic officers promoted is the same.

### e.    **Plaintiffs' Promotion Applications**

Plaintiffs were qualified for the promotions they
sought.  All seven plaintiffs had sought promotions to Detective
and/or Sergeant since at least 2002.  Adorno, Castro, Martinez,
Mendez, and Torres submitted Handwrittens in 2002 to be
considered for promotion to Detective.  (Am. Compl. ¶ 28).  These
five plaintiffs also passed the 2002 Sergeants' Examination and
were placed on the 2002 Horizontal Roster.  (Id. ¶ 57).  Welch
submitted a Handwritten for promotion to Detective in 2002, and
Rivera passed both the 1999 and 2002 Sergeants' Examinations.
Mendez and Martinez also applied for appointment to the Silver
Shield program.  (Def. Exs. D at 156-57, C at 101).

Five of the seven plaintiffs -- Rivera, Adorno, Mendez,
Martinez, and Torres -- were eventually promoted, all to the
position of Sergeant.  Rivera was promoted in May 2005.  (Pls.
Opp'n Ex. 18).  Adorno and Mendez were promoted in September
2006.  (Id.).  Martinez and Torres were promoted in January 2008.
(Pls. 56.1 ¶¶ 123, 126).

### 5.    **Translation and the Rivera Memorandum**

Many of the Port Authority's Hispanic officers shared a
concern that they were being asked to translate from Spanish to
English and vice versa, even though translation was not a part of
their job descriptions.  (Def. Exs. D at 104-20, E at 149-52, F
at 50-61).  Officers felt obligated to translate and intimidated
about refusing, even in situations where they told their
supervisors they did not speak Spanish well, spoke a different

dialect, or could not otherwise translate effectively. (<u>Id.</u>). Mendez, for example, testified that on one occasion, he was ordered by his supervisor to interpret for a prisoner. When he responded that he was not an interpreter, he was punished by being assigned to a less preferable post. (Def. Ex. D at 106-108). Mendez cannot carry a conversation in Spanish and cannot read or write Spanish. (<u>Id.</u> at 108-09). He could not recall whether he told his supervisor about the level of his Spanish skills at the time. (<u>Id.</u>).

Rivera wrote a memorandum to his CO complaining about how Hispanic officers were forced to undertake translation duties outside their job descriptions. (Pls. Opp'n Exs. 1 at 105-07, 5 at 71-73, 119). Although Rivera was a strong candidate for promotion to Sergeant, the memorandum affected his promotion. Schorno testified that:

> There was one conversation we had in which it was indicated there might be an issue with [Rivera] for a certain promotion at a certain point in time based on a memorandum he had written complaining about being -- Hispanic officers being asked to translate . . . and that this memo had rubbed his Commanding Officer the wrong way. Therefore he was in the penalty box, for lack of a better description.

(<u>Id.</u> Ex. 5 at 71-72).

According to Schorno's understanding, "the relationship between [Rivera] and his CO had been degraded by the memo, and that, you know, it had to be repaired before he could be recommended." (<u>Id.</u> at 73; <u>see also</u> <u>id.</u> at 118-19). Rivera was not promoted until May 2005, though he had passed the 1999 and 2002 Sergeants' Examinations. (<u>Id.</u> Ex. 18).

## B. **Procedural History**

In June and July 2005, each plaintiff filed a charge
with the EEOC alleging discriminatory treatment and retaliation
on the basis of their national origin. (Am. Compl. ¶ 2).
Several plaintiffs then filed amended charges in October 2005,
alleging ongoing discriminatory treatment and retaliation. (Id.
¶ 5). The EEOC issued initial right to sue letters to all
plaintiffs on October 26, 2005, and issued new right to sue
letters to the plaintiffs who filed amended charges. (Id. ¶¶ 3,
7).

The complaint in this action was filed on January 23,
2006; an amended complaint was filed on April 26, 2006. In their
amended complaint, plaintiffs assert that the Port Authority
intentionally discriminated against Hispanic officers because of
their national origin, race, and ethnicity in its promotion and
disciplinary practices, maintained a hostile work environment,
and retaliated against Hispanic officers who complained of
discriminatory treatment, in violation of Title VII of the Civil
Rights Act, as amended, 42 U.S.C. 2000(e) ("Title VII"), 42
U.S.C. § 1981, and 42 U.S.C. § 1983. They also allege that the
Port Authority's employment practices have had a disparate and
adverse impact on Hispanic officers in violation of Title VII.

During the discovery period, which was extended at
least five times, several disputes arose that led plaintiffs to
seek an order to compel. On December 11, 2007, I denied
plaintiffs' request to conduct an additional ten depositions

- 13 -

after the close of discovery and denied their request for promotions files for all individuals promoted to Sergeant since 2002. Instead, I upheld my previous order that the Port Authority produce every tenth promotion file, for the purpose of providing plaintiffs with a random sample of documents. Discovery closed in April 2008 and these two motions followed.

## DISCUSSION

The Port Authority moves for summary judgment to dismiss the complaint. Plaintiffs move under Rule 37 of the Federal Rules of Civil Procedure for the Court to sanction the Port Authority for spoliation of evidence. Because "[i]n borderline cases, an inference of spoliation, in combination with 'some (not insubstantial) evidence' for the plaintiff's cause of action, can allow the plaintiff to survive summary judgment," Byrnie v. Town of Cromwell, Bd of Educ., 243 F.3d 93, 107 (2d Cir. 2001) (citation omitted), I address plaintiffs' motion for sanctions first, and then discuss the Port Authority's motion for summary judgment.

## A.  Plaintiff's Motion for Sanctions

Plaintiffs allege the Port Authority lost or destroyed the following evidence: (1) Handwrittens submitted by police officers seeking promotion to Detective and appointment to the Silver Shield program; (2) the Rivera memorandum sent to Port Authority officials; (3) documents related to COs promotion recommendations; (4) preliminary lists of officers to be promoted; and (5) demographic data prepared by defendant's Human

- 14 -

Resources Department for Schorno and DeRienzo. Plaintiffs ask
the Court to impose sanctions. For the reasons that follow, the
motion for sanctions is denied.

## 1. **Applicable Law**

Spoliation of evidence is defined as "the destruction
or significant alteration of evidence, or the failure to preserve
property for another's use as evidence in pending or reasonably
foreseeable litigation." Byrnie, 243 F.3d at 107 (citing West v.
Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999)).
When one party alters, destroys, or otherwise fails to preserve
key evidence before it can be examined by another party, a court
may, pursuant to Fed. R. Civ. P. 37(d) or its inherent power,
impose sanctions on the party responsible for the spoliation of
evidence. See West, 167 F.3d at 779. The party seeking
sanctions bears the burden of establishing all elements of a
claim for spoliation of evidence. Byrnie, 243 F.3d at 109.

In assessing whether sanctions are warranted for the
spoliation of evidence, the court first must determine whether
the party with control of the evidence was under an affirmative
duty to preserve the evidence. Id. at 107. While a litigant is
under no duty to keep or retain every document in its possession,
"[o]nce a party reasonably anticipates litigation, it must
suspend its routine document retention/destruction policy and put
in place a 'litigation hold' to ensure the preservation of
relevant documents." Zubulake v. UBS Warburg LLC, 220 F.R.D.
212, 218 (S.D.N.Y. 2003) ("Zubulake IV"). Relevant documents are

those that a party should reasonably know are "relevant in the action, [] reasonably calculated to lead to the discovery of admissible evidence, [] reasonably likely to be requested during discovery and/or [are] the subject of a pending discovery request."  Id. at 217 (quoting Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 72 (S.D.N.Y. 1991)).  Under EEOC regulations, moreover, employers are required to preserve personnel documents relevant to a pending EEOC charge until final disposition.  29 C.F.R. § 1602.14.  These include "personnel or employment records relating to the aggrieved person and to all other employees holding positions similar to that held or sought."  Id.  The duty to preserve extends to those employees of a party who are likely to have relevant information.  Zubulake IV, 220 F.R.D. at 218.

Second, the party seeking sanctions must show that the party with control over the evidence had a "culpable state of mind."  Byrnie, 243 F.3d at 109.  Spoliation sanctions are not limited to cases where the evidence was destroyed willfully or in bad faith, but may also be imposed when a party negligently loses or destroys evidence.  See Zubulake IV, 220 F.R.D. at 220.

Third, the party seeking sanctions must show that the spoliated evidence was relevant to its claims or defenses, such that a reasonable trier of fact could find that it would support those claims or defenses.  See Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 108-09 (2d Cir. 2002); see also Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 431 ("Zubulake

- 16 -

V")("[T]he concept of relevance encompasses not only the ordinary meaning of the term, but also that the destroyed evidence would have been favorable to the movant."); Treppel v. Biovail Corp., 249 F.R.D. 111, 121-22 (S.D.N.Y. 2008).

Finally, determining the proper sanction to impose for spoliation "is confined to the sound discretion of the trial judge, . . . and is assessed on a case-by-case basis." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001). Sanctions should be designed to "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." West, 167 F.3d at 779 (citations and internal quotation marks omitted); see also Treppel, 249 F.R.D. at 123-24.

## 2.  **Application**

First, the Port Authority's duty to preserve at least some documents relevant to this litigation arose in February 2001. At that time, the Asian Jade Society, representing Asian officers, filed a charge of discrimination with the EEOC, alleging that the Port Authority, "through its discriminatory promotion and selection policies and practices, has continuously denied Asian promotions to any responsible positions." (Def. Opp'n Ex. M). The charge also claimed that "Asian officers have been by-passed for preferred and/or detailed assignments which

- 17 -

lead to advancement opportunities," and that Asian officers are
subjected to excessive discipline and retaliation for making
complaints about discrimination.  (Id.).⁵

With the filing of the Asian Jade Society's EEOC
charge, the Port Authority had reason to anticipate litigation
and was under an obligation to "put in place a litigation hold"
extending to email as well as paper documents relevant to the
charge.  Zubulake IV, 220 F.R.D. at 216-18.  Personnel documents
relevant to the Asian Jade Society charge included documents also
sought by plaintiffs as relevant to this action, such as the
Handwrittens, CO recommendations, and other documents related to
promotions.  See 29 C.F.R. § 1602.14.  Because the Asian Jade
Society's EEOC charge overlapped to some extent with plaintiffs'
claims, defendant had a duty to preserve relevant documents
beginning in February 2001.

The Port Authority argues that because the Asian Jade
Society's EEOC charge did not specify promotions to Detective or
to the Silver Shield program, the Port Authority was not on
notice to preserve documents with respect to promotion for these
positions until plaintiffs filed their EEOC charges.  (Def. Opp'n
Mem. at 11).  This argument is unavailing.  The Asian Jade
Society charge generally identifies "promotions to any
responsible positions," as well as "preferred and/or detailed

_____

⁵       The Asian Jade Society brought suit against Port
Authority based on the charge.  This suit is pending in the
Southern District of New York.  See Port Authority Police Asian
Jade Society of New York & New Jersey, Inc., et al. v. Port
Authority of New York and New Jersey, No. 05 Civ. 3835 (MGC).

- 18 -

assignments which lead to advancement opportunities." The rank of Detective, if not a "responsible position," is certainly a "preferred . . . assignment[] which lead[s] to advancement opportunities." The same can be said of the Silver Shield program.

The Port Authority had a duty to preserve documents relevant to promotions for Sergeant and Detective and appointment to the Silver Shield Program, from 2001 onward. The memorandum written by Silfredo Rivera, however, is unrelated to the Asian Jade Society's case. Therefore, the Port Authority's duty to preserve with regard to the memorandum arose in 2005 with the filing of plaintiffs' EEOC charges.[6]

Second, I conclude the Port Authority's failure to preserve documents relevant to this litigation was at worst negligent. See Zubulake IV, 220 F.R.D. at 220 ("Once the duty to preserve attaches, any destruction of documents is, at a minimum, negligent."). The Port Authority does not dispute that it failed to retain at least some of the documents at issue here. I am not convinced, however, that plaintiffs have shown a wholesale failure by the Port Authority to put in place a "litigation hold" or otherwise communicate document preservation or destruction policies to its employees, such that a finding of gross

---

[6]      Plaintiffs claim the Port Authority should have reasonably anticipated this litigation in 2003, following a series of meetings between Department leadership and the Hispanic Police Society about promotion of Hispanic officers.  (Pls. Mem. at 11).  I am not persuaded that such meetings prompted the Port Authority to reasonably anticipate litigation.

negligence by defendant would be appropriate. Cf. Heng Chan v. Triple 8 Palace, No. 03 Civ. 6048 (GEL)(JCF), 2005 WL 1925579, at *7 (S.D.N.Y. August 11, 2005) (finding gross negligence where defendant "systematically destroyed evidence because they had never been informed of their obligation to suspend normal document destruction policies"). Plaintiffs cite witness deposition testimony indicating individuals were unaware of or unfamiliar with the Port Authority's document preservation and destruction policies. (Pls. Exs. 5 at 87, 28 at 109-10). This evidence alone is insufficient to demonstrate the lack of any such policies; I decline to draw such a conclusion here. Nor is there anything in the record to suggest that the Port Authority acted wilfully or with the intent to destroy evidence that it believed would be adverse to its interests. Indeed, as Judge Cedarbaum noted in the Asian Jade Society case, the Port Authority's failure to preserve personnel materials is no doubt related in part to the attack on the World Trade Center on September 11, 2001, "which destroyed the Port Authority's executive offices and killed many of its employees." Port Authority Police Asian Jade Society of New York & New Jersey, No. 05 Civ. 3835 (MGC), 2009 WL 577665, at *2 (S.D.N.Y. Mar. 5, 2009).

Third, of the five categories of documents that are the subject of this motion, some have arguable relevance. The Handwrittens for the Detective promotions, for example, would help establish the size of the applicant pool and identify the

applicants. The Rivera Memorandum, as described by plaintiffs, arguably provides support for both the discrimination and retaliation claims. The CO recommendations are arguably relevant because they could shed light on the qualifications of both successful and unsuccessful candidates.

Ultimately, however, the request for sanctions is denied, for I am simply not persuaded on this record that a reasonable jury could find that the evidence was harmful to the Port Authority's defense of the case. Indeed, this was precisely Judge Cedarbaum's conclusion in denying the motion for sanctions in the Asian Jade Society case. See 2009 WL 577665, at *2. Although "the burden placed on the moving party to show that the lost evidence would have been favorable to it ought not be too onerous," Heng Chan, 2005 WL 1925579, at *7, when "the culpable party was negligent, there must be extrinsic evidence to demonstrate that the destroyed evidence was relevant and would have been unfavorable to the destroying party," Great Northern Ins. Co. v. Power Cooling, Inc., No. 06 Civ. 874 (ERK)(KAM), 2007 WL 2687666, at *11 (E.D.N.Y. Sept. 10, 2007) (citation omitted).

I am not persuaded that the documents in question would have been unfavorable to the Port Authority. Plaintiffs have not shown, for example, when the Rivera memorandum was written or submitted to the Port Authority, and hence it is unclear whether the Port Authority was under a duty to preserve it. Moreover, Rivera himself did not keep a copy of the memorandum, and thus he can hardly complain that the Port Authority did not retain one.

The CO promotion recommendations varied widely in substance and format, and plaintiffs' assertion that these recommendations would have been favorable to them (and implicitly not to other applicants) is speculative. In addition, the documents themselves are not necessary to prove that different COs used varying criteria. As to the purported lists of proposed promotions, I am not persuaded that they actually existed. Plaintiffs' assertion that the Port Authority lost or destroyed demographic data rings hollow in light of the fact that plaintiffs have been provided in discovery with demographic data by year, race, and rank, and Department leaders acknowledged, based on the data they reviewed, that they believed Hispanic officers were under-represented in promotions. (Pls. Opp'n Exs. 5 at 30, 51-53, 7 at 141-47). Finally, the Handwrittens were not substantive applications but rather one-line expressions of interest in promotion. It is hard to imagine that these documents, if they existed, would significantly assist plaintiffs, and it is hard to imagine what adverse inference a jury could reasonably draw from the fact they no longer exist.

Plaintiffs' motion for sanctions is denied.

## B. Defendant's Motion for Summary Judgment

The Port Authority contends the amended complaint must be dismissed because plaintiffs cannot show prima facie violations of Title VII and § 1981 for discriminatory failure to promote, disparate impact, retaliation, and hostile work environment and excessive discipline. The Port Authority also

- 22 -

moves to dismiss all of plaintiffs' claims under § 1983 for failure to show a policy or practice of discrimination against plaintiffs or Hispanic police officers generally. (Def. Mem. at 20). Last, defendant asserts that all claims arising before January 23, 2002 are time-barred.

Employment discrimination claims brought under 42 U.S.C. §§ 1981 and 1983 are analyzed under the same framework as claims brought under Title VII. See Gant v. Wallingford Bd. of Educ., 195 F.3d 134, 146 (2d Cir. 1999); Chambers-English v. Unisys Corp., No. 05 Civ. 2976 (DC), 2007 WL 256441, at *5 (S.D.N.Y. Jan. 31, 2007); Clemmons v. Stuyvesant High School, No. 00 Civ. 4158 (LMM), 2006 WL 4888057, at *6 (S.D.N.Y. Oct. 12, 2006).[7] Accordingly, I analyze plaintiffs' claims under the three statutes together.

## 1. Summary Judgment Standard

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing

---

[7] Although the Port Authority makes a separate argument that plaintiffs' § 1983 theory fails because a municipality (and the Port Authority is treated as a municipality for purposes of § 1983) is liable under § 1983 only when there is proof of a municipal policy, here, as discussed below, the evidence of a pattern and practice of discriminatory treatment is tantamount to evidence of a municipal policy.

- 23 -

all reasonable inferences against the moving party, finds that
the dispute about a material fact is "such that a reasonable jury
could return a verdict for the nonmoving party." See Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

To defeat a motion for summary judgment, the nonmoving
party "must do more than simply show that there is some
metaphysical doubt as to the material facts." Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As
the Supreme Court held in Anderson, "[i]f the evidence is merely
colorable, or is not significantly probative, summary judgment
may be granted." Anderson, 477 U.S. at 249-50 (internal
citations omitted). The nonmoving party may not rest upon mere
conclusory allegations or denials, but must set forth "concrete
particulars" showing that a trial is needed. Nat'l Union Fire
Ins. Co. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989)
(quoting R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77
(2d Cir. 1984) (internal quotations omitted)). Accordingly, it
is insufficient for a party opposing summary judgment "merely to
assert a conclusion without supplying supporting arguments or
facts." BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d
603, 615 (2d Cir. 1996) (internal citations and quotations
omitted).

## 2. Statute of Limitations

Defendant moves to dismiss as time-barred plaintiffs'
claims arising before January 23, 2002. In this case, the
longest applicable statute of limitations is four years under

- 24 -

§ 1981. See 28 U.S.C. § 1658; Jones v. R.R. Donnelley & Sons, Co., 541 U.S. 369, 382 (2004). Plaintiffs commenced this action on January 23, 2006; hence, their claims arising prior to January 23, 2002, are time-barred.

Plaintiffs concede that only Rivera has claims arising before January 23, 2002. (Pls. Opp'n Mem. at 3-4). They argue, however, that defendant's failure to promote Rivera in 1999 when he passed the Sergeants' examination and was placed on the Sergeants' Roster was a continuing violation, thereby preserving Rivera's claim. (Id. at 4). Plaintiffs are mistaken. The Supreme Court has held that the failure to promote is a discrete act that cannot form the basis of a continuing violation. See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002). Accordingly, Rivera's claims arising before January 23, 2002 are time-barred.

### 3.   **Failure to Promote**

Plaintiffs allege the Port Authority's procedures for promotion to Detective and Sergeant and appointment to the Silver Shield program discriminated against Hispanic Officers. Because plaintiffs allege systemic discrimination in the work place, I analyze their failure to promote claim under both disparate treatment and disparate impact theories. See Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 158, n.3 (2d Cir. 2001); Wright v. Stern, 450 F. Supp. 2d 335, 362-69 (S.D.N.Y. 2006). The Port Authority moves for summary judgment on both the disparate treatment and disparate impact theories, arguing

- 25 -

plaintiffs have failed to establish a prima facie case and cannot
prevail on their ultimate burden of proving discrimination. For
the reasons that follow, I deny the Port Authority's motion as to
plaintiffs' disparate treatment claim but grant it as to
plaintiffs' disparate impact claim.

### a. Disparate Treatment

#### i. Applicable Law

In pattern or practice disparate treatment cases such
as this one, plaintiffs must present sufficient evidence to meet
their prima facie burden of showing that defendants had a policy,
pattern, or practice of intentionally discriminating against a
protected group. Robinson v. Metro-North Commuter R.R., 267 F.3d
at 158 (pattern or practice disparate treatment claim involves
"allegations of widespread acts of intentional discrimination
against individuals").

To meet this burden, plaintiffs typically rely on two
types of evidence: "'(1) statistical evidence aimed at
establishing the defendant's past treatment of the protected
group, and (2) testimony from protected class members detailing
specific instances of discrimination.'" Id. (quoting 1 Arthur
Larson et al., Employment Discrimination § 9.03[1], at 9-18 (2d
ed. 2001)); see also 1 Merrick T. Rossein, Employment
Discrimination Law and Litigation § 2:28, at 2-94 (2006) ("It is
important always to present stories of actual discrimination
against individuals to make the statistics come alive . . . .").
For statistics to give rise to an inference of discrimination,

they must be statistically significant, for disparity among protected and unprotected groups will sometimes result by chance. Ottaviani v. State Univ. of N.Y., 875 F.2d 365, 371 (2d Cir. 1989).

If the plaintiff establishes a prima facie case, a rebuttable presumption of discrimination arises, and "[t]he burden then shifts to the employer to . . . demonstrat[e] that the [plaintiffs'] proof is either inaccurate or insignificant." Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 360 (1977); see also Robinson, 267 F.3d at 159.  The defendant may present its own statistics and/or present anecdotal and other non-statistical evidence to rebut the inference of discrimination.  Robinson, 267 F.3d at 159.

If the defendant satisfies its burden of production, the burden shifts back and the fact-finder must consider whether plaintiffs have established by a preponderance of the evidence that the defendant engaged in a pattern or practice of intentional discrimination.  Id.  Plaintiffs must demonstrate that intentional discrimination was the employer's "standard operating procedure," and proof of random or isolated acts of discrimination will not be enough to make out such a claim. Teamsters, 431 U.S. at 336; see also Robinson, 267 F.3d at 158. On summary judgment, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an

inference of discrimination on the basis of race, age, or some other impermissible factor.  See James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).

### ii.  **Application**

The evidence before the Court raises genuine issues of material fact as to whether defendants discriminated against Hispanic officers in promotions.  The anecdotal and statistical evidence presented by plaintiffs could lead a reasonable jury to find in favor of plaintiffs on the ultimate issue of discrimination; therefore, summary judgment is inappropriate.

First, plaintiffs present evidence that they were each qualified for promotion, some highly qualified.  They also identify arguably less-qualified non-Hispanic officers who were promoted to Detective or Sergeant or appointed to the Silver Shield program before plaintiffs.  See Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (comparing treatment of plaintiff to similarly situated employees outside the protected group is a recognized method of raising an inference of discrimination).  For example, both Rivera and Mendez were recommended for promotion to Sergeant and received unanimous "yes" votes at a Chief's Board meeting convened to make final recommendations to DeRienzo.  (Pls. Opp'n Exs. 7 at 195-96, 35).  They were not promoted until May 2005 and September 2006, respectively.  Meanwhile, a non-Hispanic officer, Stephen Grossi, was also considered by the Chief's Board and received four "yes" votes and four "no" votes, indicating a "stalemate."  (Id. Ex.

- 28 -

34). Although then-Superintendent DeRienzo insisted he never promoted anyone without recommendation from the Chief's Board (id. Ex. 9 at 152-53), Grossi was promoted to Sergeant in January 2003 (id. Ex. 18).

Second, plaintiffs also present evidence that Rivera, who was otherwise highly qualified, was held back from promotion solely because of the memorandum he wrote complaining about translation duties imposed on Hispanic officers. (Id. Exs. 1 at 105-07, 5 at 71-73, 23). Instances of discriminatory retaliation in promotion decisions support an inference of discrimination. See Wright v. Stern, 450 F. Supp. 2d at 365. Here, this evidence raises a genuine issue of material fact about discriminatory treatment towards Rivera. It also supports a claim of discriminatory retaliation against Hispanic officers in general.

Third, a reasonable fact-finder could find that defendant's promotion procedures were sufficiently subjective such that discrimination could be permitted to "flourish." Wright v. Stern, 450 F. Supp. 2d at 365; see also Byrnie, 243 F.3d at 104 (wholly subjective unarticulated standards for promotion impermissible) (quoting Knight v. Nassau County Civil Serv. Comm'n, 649 F.2d 157, 161 (2d Cir. 1981)). Plaintiffs present evidence of unstructured and inconsistent promotions procedures marked by a lack of documentation and no articulated standards or criteria. "Although the absence of objective criteria does not, without more, show discriminatory intent . . . [an employer's] inability to demonstrate that it relies only on

- 29 -

race-neutral factors in making promotions leaves it more vulnerable to charges of discrimination." Fahmy v. Duane Reade, Inc., No. 04 Civ. 1798 (DLC), 2006 WL 1582084, at *8 n.11 (S.D.N.Y. June 9, 2006).  Here, promotions were heavily determined by CO recommendations, and COs were given no criteria on how to make their recommendations.  From the CO recommendations, department leadership then made their final promotion decisions, but they also had no formal criteria or written guidelines to guide them.  Viewing the evidence in the light most favorable to plaintiffs, the lack of criteria in promotions is sufficient to raise a genuine issue of material fact, precluding summary judgment.

Finally, plaintiffs' statistical evidence, while insufficient to support an inference of discrimination on its own, does show some disparity between the promotion of Hispanics and non-Hispanics.  See Stratton v. Dep't for the Aging for the City of New York, 132 F.3d 869, 877 (2d Cir. 1997) (upholding use of simple statistics to support claim of discrimination).  For example, while Hispanics constituted 13.6 to 14.1 percent of the police officer population from 2002 to the end of 2005 (Pls. Opp'n Ex. 25), only two Hispanic officers were promoted to Sergeant from 2002 to 2004, out of a total of fifty-seven promotions in that time period (3.5 percent of promotions).  The number and percentage of Hispanic officers promoted to Sergeant greatly increased in 2005 and 2006; these promotions occurred, however, after Port Authority became aware of plaintiffs' intent

to file EEOC discrimination charges and the instant lawsuit.
(Id. Exs. 5 at 115-16, 18, 32). Promotions of a protected group
made in anticipation of litigation can be given less weight. See
Holcomb v. Iona College, 521 F.3d 130, 143 (2d Cir. 2008)
(curative measures do not prove past discrimination did not
occur) (citing Gonzales v. Police Dep't, City of San Jose, 901
F.2d 758, 762 (9th Cir. 1990)). Here, defendant's statistical
expert conceded that the high number of Hispanic promotions to
Sergeant in 2005 and 2006 was statistically significant and would
not have occurred purely by chance. (Pls. Opp'n Ex. 14 at 213-
16). Drawing all inferences in favor of plaintiffs, then, a
reasonable jury could find the high numbers of Sergeant
promotions in 2005 and 2006 were motivated to conceal past
discrimination in promotions from 2002 to 2004.

The Port Authority argues that plaintiffs have failed
to show their race, national origin, and/or ethnicity played any
role in the decision to promote other officers over plaintiffs.
I disagree. Although plaintiffs' evidence is not overwhelming as
to discriminatory treatment, a reasonable jury could find that
their promotions were denied or delayed at least in part because
they were Hispanic. The Port Authority has not come forward with
any evidence to rebut plaintiffs' evidence regarding the
promotion of Grossi ahead of other qualified and recommended
Hispanic candidates such as Rivera and Mendez. Nor have they
addressed the alleged retaliation by the Port Authority against
Rivera. The Point Authority points out that plaintiffs have not

- 31 -

produced the Rivera memorandum, seemingly to dispute its existence.  This argument, however, ignores deposition testimony regarding the memorandum and how it impacted Rivera's chances for promotion.  (See id. Ex. 5 at 71-72).  The Port Authority also fails to adequately eliminate fact questions raised by plaintiffs' evidence on the lack of standards in its promotions practices.

In light of plaintiffs' evidence, it is not for the Court to decide on summary judgment whether plaintiffs faced disparate treatment in promotions.  The Port Authority has failed to show the absence of a genuine issue of material fact on plaintiffs' disparate treatment claim; its motion is therefore denied.

### b.    Disparate Impact

#### i.    Applicable Law

Federal employment discrimination statutes prohibit not only overt and intentional discrimination, but also facially neutral practices that have a disparate impact on protected groups.  See Gulino v. New York State Educ. Dept., 460 F.3d 361, 382-83 (2d Cir. 2006); Malave v. Potter, 320 F.3d 321, 325 (2d Cir. 2003).  "[W]here the inquiry in a pattern-or-practice disparate treatment claim is focused on determining the existence of discriminatory intent, disparate impact claims are concerned with whether employment policies or practices that are neutral on their face and were not intended to discriminate have nevertheless had a disparate effect on the protected group."  Robinson, 267 F.3d at 160 (citation omitted).

To meet their prima facie burden in their disparate
impact claim, plaintiffs must demonstrate that the employer "uses
a particular employment practice that causes a disparate impact
on the basis of race" or other protected characteristic.   42
U.S.C. § 2000e-2(k)(1)(A)(i).  Specifically, plaintiffs "must (1)
identify a policy or practice, (2) demonstrate that a disparity
exists, and (3) establish a causal relationship between the two."
Robinson, 267 F.3d at 160; see also Gulino, 460 F.3d at 382.

The disparity in a disparate impact claim must be
"substantial" or "significant."  Robinson, 267 F.3d at 160.  Thus
"statistical proof almost always occupies center stage in a prima
facie showing of a disparate impact claim."  Id.  Plaintiffs'
statistics "must be of a kind and degree sufficient to reveal a
causal relationship between the challenged practice and the
disparity."  Id.; see also Gulino, 460 F.3d at 382 ("[P]laintiff
must . . . produce statistical evidence showing that the
challenged practice 'causes a disparate impact on the basis of
race, color, religion, sex or national origin.'").  Although
there are no bright-line rules for determining whether a
statistical disparity is sufficiently substantial to establish a
prima facie case of disparate impact, courts general consider a
disparity of two standard deviations sufficient to warrant an
inference of discrimination.  Malave, 320 F.3d at 327.

## ii.  **Application**

Based on the statistical evidence put forth by
plaintiffs, a reasonable fact-finder could not find plaintiffs

have met their prima facie burden of showing defendant's facially neutral policies or practices caused a significant disparity in promotions. See Robinson, 267 F.3d at 160.

Plaintiffs have simply presented no evidence "reveal[ing] a causal relationship" between the Port Authority's policies or practices and a disparity in promotions for Hispanic officers. Id. In an attempt to show a statistically significant disparity sufficient to establish causation, plaintiffs point to the low number of Hispanic officers promoted from 2002 to the end of 2005. (Pls. Opp'n Mem. at 18-19). They offer no statistical analysis of the numbers, however, instead merely attacking defendant's expert's conclusions. (Id.). This is insufficient to meet their burden.

Plaintiffs argue that expert analysis showing a statistically significant disparity is not always required to make out a disparate impact claim. (Id. at 18). In this case, however, the quantitative evidence is insufficient to raise a genuine issue of material fact. Hispanic police officers comprised 13.6 to 14.1 percent of the officer population between 2002 to the end of 2005, and 10 percent of the 2002 Sergeants' Roster. (Pls. Opp'n Ex. 25; Ford Aff. ¶ 12). During that time period, 10.6 percent of the forty-seven officers promoted to Detective were Hispanic. (Pls. Opp'n Ex. 18). Out of the eighty-six officers promoted to Sergeant, 11.6 percent were Hispanic. (Id.). Not counting Sergeant promotions made in 2005, which plaintiffs allege were affected by defendant's anticipation

- 34 -

of this litigation, then 3.5 percent of the fifty-seven officers
promoted to Sergeant from 2002 to 2004 were Hispanic.  (Id.).
Last, 9.5 percent of the forty-two officers appointed to the
Silver Shield program were Hispanic.  (Id.).  These percentages,
especially in light of the relatively small sample sizes, are not
of the "kind and degree sufficient to reveal a causal
relationship between the challenged practice and the disparity."
Robinson, 267 F.3d at 160.  "[U]nderrepresentation of [a
protected group] might result from any number of factors."  Brown
v. Coach Stores Inc., 163 F.3d 706, 712 (2d Cir. 1998).
Plaintiffs do not provide sufficient evidence to allow a
reasonable fact-finder to infer causation.

        Disparate impact claims target policies and practices
that are "neutral on their face" and "not intended to
discriminate."  Robinson, 267 F.3d at 160.  As discussed above, a
reasonable jury could find the disparate promotion numbers
support an inference of discrimination when considered alongside
the evidence underlying plaintiffs' disparate treatment claim.
Accordingly, plaintiffs' failure to promote claim should proceed
under that theory, not as a disparate impact claim.  The Port
Authority's motion to dismiss plaintiffs' disparate impact claim
is therefore granted.

## 4. Retaliation

### a. Applicable Law

        In the absence of direct evidence of retaliation, a
plaintiff alleging retaliatory adverse employment action usually

relies on the burden-shifting McDonnell Douglas framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (citing cases). The plaintiff must show the following to make out a prima facie case of unlawful retaliation: (1) he was engaged in protected activity; (2) the defendant was aware of that activity; (3) the plaintiff suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. Distasio v. Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998).

If the plaintiff establishes a prima facie case, a rebuttable presumption of retaliation arises, and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000); Gallagher v. Delaney, 139 F.3d 338, 349 (2d Cir. 1998) (abrogated on other grounds). If the employer articulates a nondiscriminatory reason for its actions, the presumption of retaliation is rebutted, and the burden then shifts back to the plaintiff to show, without the benefit of any presumptions, "sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation." Gallagher, 139 F.3d at 349; see also Myrick v. New York City Employees Ret. Sys., No. 99 Civ. 4308 (GEL), 2002 WL 868469, at *5 (S.D.N.Y. May 3, 2002).

### b. Application

As discussed above, genuine issues of material fact exist as to defendant's alleged retaliation against Hispanic officers for complaining about translation duties. Plaintiffs have presented evidence showing not only that Rivera's promotion was delayed because of the memorandum he wrote, but also that other plaintiffs were punished for refusing to interpret from Spanish to English, even if they did not speak Spanish at a proficient level. (Def. Ex. D 106-08). Although defendant questions the existence of the Rivera memorandum, plaintiffs have presented the deposition testimony of DeRienzo and Charles Torres attesting to its existence and to the fact that Rivera's promotion was delayed because "some people took offense to the letter." (Pls. Opp'n Ex. 1 at 105). Defendant has failed to show the absence of material fact issues on plaintiffs' retaliation claim. Accordingly, defendant's motion to dismiss the retaliation claim is denied.

## 5. Hostile Work Environment and Excessive Discipline

### a. Applicable Law

"[W]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17,

21 (1993)) (internal quotation marks omitted); see also Schiano
v. Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006).

Where plaintiffs allege a pattern or practice of a
hostile work environment, courts have held that plaintiffs must
demonstrate by a preponderance of the evidence that an
objectively reasonable person would find the existence of: (1) a
hostile environment of harassment within the company against a
protected group; and (2) a company policy of tolerating (and
therefore condoning and/or fostering) a workforce permeated with
severe and pervasive harassment. See Wright v. Stern, 450 F.
Supp. 2d at 369-71; Employees Committed for Justice v. Eastman
Kodak Co., 407 F. Supp. 2d 423, 430 (W.D.N.Y. 2005); EEOC v. Dial
Corp., 156 F. Supp. 2d 926 (N.D. Ill. 2001); EEOC v. Mitsubishi
Motor Mfg. of Am., Inc., 990 F. Supp. 1059, 1073 (C.D. Ill.
1998).

Summary judgment is appropriate only "if it can 'be
concluded as a matter of law that no rational juror could view
[the alleged conduct] as . . . an intolerable alteration of . . .
working conditions.'" Holtz v. Rockefeller & Co., Inc., 258 F.3d
62, 75 (2d Cir. 2001) (citation omitted). Sporadic or episodic
instances of harassment will generally not be sufficient to
survive summary judgment on a claim of hostile work environment
harassment, unless "a single incident was extraordinarily severe,
or . . . a series of incidents were 'sufficiently continuous and
concerted' to have altered the conditions of [the] . . . working
environment." Cruz v. Coach Stores, Inc., 202 F.3d at 570

(quoting <u>Perry v. Ethan Allen, Inc.</u>, 115 F.3d 143, 149 (2d Cir. 1997)). Factors to be considered in evaluating whether a work environment is sufficiently hostile include "the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" <u>Holtz</u>, 258 F.3d at 75 (quoting <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787-88 (1998)).

### b. **Application**

Plaintiffs' evidence in support of their hostile work environment claim is insufficient to raise a genuine issue of material fact. Plaintiffs cite to the problem of Hispanic officers being required to translate as evidence of a hostile work environment. (Pls. Opp'n Mem. at 16). While I have determined that fact issues concerning translation duties preclude summary judgment on plaintiffs' retaliation claim, plaintiffs' evidence is insufficient to support a finding that plaintiffs or other Hispanic officers suffered "discriminatory intimidation, ridicule, and insult" from being required to translate that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. at 116.

Plaintiffs also cite a disciplinary incident involving plaintiff Castro as evidence of a hostile work environment involving excessive discipline against Hispanic officers. (Pls.

Opp'n Mem. at 15-16).  Plaintiffs allege that baseless
disciplinary charges were improperly filed against Castro in
March 2002 and that no procedures were followed, no explanations
were given, and no apology offered for the improperly filed
charges.  (Id.).  They concede, however, that the charges were
withdrawn with prejudice.  (Id.).  This incident is wholly
insufficient to raise a genuine issue as to hostile work
environment or excessive discipline of Castro.  Castro faced only
"Minor Discipline," and all charges were withdrawn.  (Pls. Opp'n
Ex. 22).  Moreover, Castro was notified of the withdrawal and
told to check his personnel file to ensure the charges were
removed from his folder.  (Id.).  Defendant's motion to dismiss
plaintiffs' hostile work environment and excessive discipline
claims is therefore granted.

## CONCLUSION

For the foregoing reasons and to the extent set forth
above, plaintiffs' motion for sanctions is denied and the Port
Authority's motion for summary judgment is denied in part and
granted in part.  Remaining for trial are plaintiffs' disparate
treatment and retaliation claims.  The parties shall appear for a
final pretrial conference with the Court on April 24, 2009 at 10
a.m.

SO ORDERED.

Dated:   New York, New York
         March 31, 2009

                                    DENNY CHIN
                                    United States District Judge

- 40 -